# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GEORGIA A. DUTCHER,

       Plaintiff,

v.                                                             CV 13-854 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Georgia Dutcher applied for Disability Insurance Benefits and Supplemental Security Income ("SSI") on August 18, 2009, based on knee injuries, fatigue, and irritability.[1] (Administrative Record ("AR") 134, 136, 152.) After her applications were denied at all administrative levels, she brought this proceeding for judicial review. The case is before me now on Dutcher's Motion to Reverse and Remand for a Rehearing, a response filed by the Commissioner of the Social Security Administration ("SSA"), and Dutcher's reply. (Docs. 18-20.) For the reasons explained below, I deny Dutcher's motion to reverse and remand, and dismiss the case.

### STANDARD OF REVIEW

When the Appeals Council denies a claimant's request for review, the Administrative Law Judge's ("ALJ") decision is the SSA's final decision. In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the

---

[1] Dutcher did not meet the insured status requirements for disability insurance; therefore, only the SSI application is at issue in this case. (*See* AR 139; Doc. 18 at 2.)

correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the claimant must show (1) that she is not performing a substantial gainful activity; (2) that she has an impairment severe enough to significantly limit her ability to do basic work activities; and (3) that her impairment or impairments, individually or in the aggregate, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.920.

If the claimant does not satisfy the third prong, the ALJ must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations.

2

*See* 20 C.F.R. § 416.920(e). An RFC assessment requires two steps: first, determining whether there is an underlying medically determinable physical or mental impairment or impairments that could reasonably be expected to produce the pain or symptoms; and second, evaluating the intensity, persistence, and limiting effects of all medically determinable impairments to determine the extent to which they limit the claimant's functioning. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013). In cases where symptoms such as pain are alleged, the RFC determination must be supported by a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints; resolve any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects of the symptoms on the individual's ability to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[2] Credibility determinations on a claimant's report of symptoms must contain specific reasons for the finding on credibility and be sufficiently specific to make clear to the individual or subsequent reviewers what weight the ALJ gave to the individual's statements and the reasons for that weight. SSR 96-7p, 1996 WL 374186, at *4-5.

At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25; 20 C.F.R. § 416.920(a)(4)(i-iv). At the fifth step, the burden shifts to the Commissioner to show that the claimant is capable, based on her vocational factors, of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25.

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

## FACTUAL BACKGROUND

Dutcher is a forty-nine-year-old woman with an Associate's Degree in Business Administration. (AR 34, 134.) She previously worked as a temporary office assistant, a teacher's aide, a salad server, a food preparation assistant, a customer service representative, and a cashier. (AR 153.) Dutcher claims disability beginning on July 5, 2009, based on anterior cruciate ligament ("ACL") and medial meniscus tears of her left knee. (AR 61.)

On July 5, 2009, Dutcher fell on a slippery concrete floor while working at Faith Christian Church and injured her left knee. She went to the emergency room at Plains Regional Medical Center ("PRMC") and complained of pain throughout her left leg. (AR 234, 238.) Leonare Herrera, M.D., noted that Dutcher had limited range of motion in her left knee and was unable to bear weight. (AR 238.) Dr. Herrera ordered x-rays of the left knee, the results of which were negative. (AR 235-36.)

Crawford & Company, the church's workers compensation carrier, referred Dutcher to Eastern New Mexico Physicians & Surgeons, LLC, for an evaluation. (AR 244.) Jacob George, M.D., evaluated Dutcher. (AR 246.) Dutcher "[a]mbulated with antalgia, preferring to keep the left knee stiff. Surprisingly, she does heel and toe stand with support." (*Id.*) Dr. George observed some crepitus in Dutcher's left knee and discomfort exhibited along the medial joint line. (AR 247.) He ordered weight-bearing films and found moderate degenerative arthritis—slightly more pronounced in the left knee—with medial compartment narrowing. (*Id.*) Dr. George diagnosed Dutcher with a left knee contusion hematoma and knee internal derangement. (*Id.*) He prescribed Relafen and ordered an MRI. (*Id.*)

Robert Forbes, M.D., performed Dutcher's MRI on August 4, 2009, at Clovis Open MRI. (AR 252.) He noted a large bone contusion involving the posterior half of Dutcher's lateral tibial

plateau and posterior third of the medial plateau. (AR 251.) Dr. Forbes also found a subchondral fracture within the central weight-bearing surface of Dutcher's lateral femoral condyle. (*Id.*) The MRI showed a complete or near-full-thickness tear of the femoral attachment of Dutcher's ACL, a moderate-sized knee joint effusion, and a bucket handle tear of the medial meniscus with a displaced meniscal fragment within the intercondylar notch immediately adjacent to the undersurface of the posterior cruciate ligament. (*Id.*)

Joel Sievers, M.D., began treating Dutcher at Sievers Sports Medicine on August 11, 2009. (AR 262.) Dutcher complained of constant, sharp, dull, achy, moderate pain in her left leg, aggravated by walking or standing for long period of time. (AR 261.) Dutcher rated her pain as eight out of ten. (*Id.*) Dr. Sievers's notes further indicate that he referred Dutcher to R. Sann Gossum, M.D., Orthopaedics & Sports Medicine of Santa Fe (AR 268), for surgery that was "absolutely needed for [the] bucket handle meniscus tear" and probably for ACL reconstruction as well (AR 261). Dr. Sievers noted that Dutcher was allowed to return to light-duty work on August 11, 2009, but was not allowed to stand, bend, or walk in excess of five minutes and could only do light-duty work. (AR 263.) "[I]f that is not available, [Dutcher] will be unable to work until after repair." (*Id.*) Dr. Sievers prescribed pain medication on August 25, 2009 (AR 269), and ordered crutches for Dutcher on August 26, 2009 (AR 270).

Dr. Gossum saw Dutcher on September 28, 2009, and noted complaints of pain, swelling, spasms, weakness, and tingling in her left leg, with occasional giving way, and further complaints that symptoms were affecting her sleep. (AR 291.) Dutcher rated her pain as eight out of ten. (*Id.*) Dr. Gossum found normal stability in Dutcher's knees, with some tenderness over the medial and lateral joint lines of the left knee. (*Id.*)

N.D. Nickerson, M.D., non-examining state agency medical consultant, conducted a physical RFC assessment of Dutcher on October 21, 2009. (AR 288.) The assessment gauged Dutcher's future functionality at twelve months after the onset of her alleged disability. (AR 281.) Based on the record in front of her, Dr. Nickerson found exertional limitations such that Dutcher would be able to: occasionally lift or carry up to twenty pounds; frequently lift or carry up to ten pounds; stand or walk, with normal breaks, for about six hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; and push or pull subject to the above weight limitations. (AR 282.) Dr. Nickerson noted that, "[w]ith repair of the ACL tear, it is reasonable to propose the capability to sustain work at a light level of exertion within twelve months of the [July 2009 left] knee injury." (AR 283.) Dutcher's postural limitations would include: frequent climbing of ramps, stairs, ladders, ropes, and scaffolds; and frequent balancing, stooping, kneeling, crouching, and crawling. (*Id.*) Dr. Nickerson indicated that Dutcher would experience no manipulative, visual, communicative, or environmental limitations. (AR 284-85.) Dr. Nickerson further concluded that Dutcher's symptoms were attributable to a medically determinable impairment and that the medical source conclusions did not significantly differ from the RFC findings. (AR 286-87.)

Dutcher returned to Dr. Gossum for knee surgery on October 22, 2009. (AR 289.) Dr. Gossum diagnosed Dutcher with an ACL deficient left knee with a medial meniscus tear. (*Id.*) He performed a partial arthroscopic medial meniscectomy. (*Id.*) "Several attempts were made to reduce [Dutcher's] meniscal fragment. The meniscus was firmly entrapped within the notch and could not be reduced despite multiple attempts." (AR 290.) On December 14, 2009, Dr. Gossum referred Dutcher for physical and occupational therapy for strengthening and range of motion of her left knee, two times a week for one month. (AR 375.)

6

On March 3, 2010, Gerald Hill, M.D., performed an Impairment Rating Examination on Dutcher at the behest of Jane Harrell, the insurance adjuster for Crawford & Company. (AR 360.) Dr. Hill noted that Dutcher had received approximately one month of physical therapy after her meniscectomy and last saw Dr. Gossum on January 26, 2010. (AR 361.) He considered Dutcher to have been released from Dr. Gossum's care at "maximal medical improvement." (*Id.*) Dr. Hill observed a mild to slight limp favoring Dutcher's left leg, and noted that she was not using any kind of cane or ambulatory assistive device. (*Id.*) Aside from the limp, Dr. Hill observed Dutcher to walk fairly briskly and fluidly. (*Id.*) Dr. Hill further noted mild to moderate laxity in the ACL and found the lateral cruciate ligament to be mildly loose. (AR 362.) He assessed Dutcher with a chronic pain syndrome with traumatic arthritis. (*Id.*) Finally, Dr. Hill noted that Dr. Gossum "agrees there is significant ACL laxity." (*Id.*) Dr. Hill assessed Dutcher with an eight percent "whole person" impairment rating, and a twenty percent lower extremity impairment rating. (*Id.*)

John Pataki, M.D., state agency medical consultant, conducted an update to Dutcher's physical RFC assessment on March 24, 2010. (AR 294.) Dr. Pataki affirmed the physical RFC as written, even after the partial medial meniscectomy. (*Id.*)

On May 11, 2010, Dutcher was treated at the PRMC Emergency Room, complaining of knee pain and swelling. (AR 330.) Matthew Todaro, M.D., ordered x-rays of her left leg. (AR 338.) Radiologist Michael Rowley, M.D., performed the x-rays and found her hip and left femur to be normal, with no definite fluid in the joint and no fracture. (AR 331.) Dr. Rowley noted a little medial joint space narrowing, and "maybe a little swelling anteriorly of the soft tissues," but found the left tibia and fibula to be normal. (*Id.*) Dr. Todaro advised Dutcher to see someone about having an ACL reconstruction. (AR 338.)

Dutcher went to Jason C. Schwope, Licensed Professional Clinical Counselor ("LPCC"), for counseling on May 5, 2011. (AR 299.) Schwope performed a mental status examination on Dutcher and found her to have slowed motor activity, anxious mood, neutral affect with full range and congruent mood, logical thought processes, and fair insight, judgment, and impulse control. (AR 300.) Dutcher complained of daily crying spells and the inability to sleep through the night; she reported financial stress in her life. (AR 299.)

On May 11 and May 18, 2011, Dutcher returned to Schwope and was "improving" overall, with a follow-up session scheduled for one week later. (AR 302-03.) On May 25, 2011, Dutcher reported feeling stressed and depressed since her son returned from prison. (AR 304.) Dutcher said that her son could not live with her because she lived too close to a school. (*Id.*) Schwope noted moderate regression in Dutcher that week. (*Id.*) By June 8, 2011, Schwope indicated that Dutcher was again "improving" overall. (AR 305.)

Dutcher returned to the PMRC Emergency Room on October 23, 2011, after injuring her right arm while cashiering at Walmart. (AR 326.) She reported her pain as an eight out of ten, was unable to extend her right arm completely, and felt pain in her forearm up from her third finger that was described as numb and shooting. (*Id.*) David James, P.A., diagnosed Dutcher with a strain of her right forearm, wrist, and arm. (AR 329.) X-rays showed no acute fracture, no elbow joint effusion, and no focal soft tissue swelling. (AR 323.)

William Sisco, M.D., treated Dutcher at Presbyterian Clovis General Surgery on October 31, 2011. (AR 348.) Dutcher reported her right arm pain to be better than it was a week before and that she had increased movement in the limb. (*Id.*) Dr. Sisco noted the right arm to be "[m]uch improved but still . . . a long way from normal." (*Id.*) Dutcher was taking Vicodin and ibuprofen, as needed, for pain. (*Id.*)

Dr. Sisco ordered a CT scan of Dutcher's right upper extremity on November 7, 2011. (AR 320.) Dr. Rowley performed the CT and found no fractures or loose bodies and no fluid in the joint. (AR 321.) Dr. Rowley noted slight subcutaneous swelling posteriorly in the soft tissues of the elbow, but found the bones to show little degenerative change at the ulnar humeral joint, the radial head intact, and no definite abnormalities of the muscles. (*Id.*)

Dutcher was diagnosed with a right elbow sprain by Abdullah Mubarak, M.D., at the PRMC Therapy Clinic on November 11, 2011. (AR 319.) She was seen by Firo Kasaie, C.N.P., for a follow up on her arm on November 14, 2011. (AR 347.) At that time, Dutcher reported performing all normal activities, with slight tenderness upon palpation of the right lateral and medial condyle. (*Id.*) Kasaie considered Dutcher's sprain to be "resolving." (*Id.*)

Dutcher appeared at the PRMC Emergency Room on February 3, 2012, complaining of dull, severe left leg pain. (AR 339.) She was noted as ambulating without deficits. (AR 344.) The attending physician ordered x-rays, which showed a probable small knee joint effusion and mild osteoarthritis with small knee joint effusion. (AR 341.)

After the hearing and the ALJ's decision, Lynn Gonzales, LPCC, of Mental Health Resources, Inc. ("MHR"), performed a Comprehensive Assessment for Adults on Dutcher on April 24, 2012. (Doc. 18 Ex. 1 at 2-16.) Dutcher complained of depressive symptoms and "report[ed] that her depression is due to her medical issues which keep her from being able to work and function like she would like to." (*Id.* at 13.) Dutcher complained of symptoms including crying spells, helplessness, and hopelessness, that occurred at least four times per week. (*Id.*) Gonzales did not issue a diagnosis, but noted that Dutcher agreed that her symptoms would be alleviated if she were able to find employment. (*Id.*)

9

### HEARING TESTIMONY

The ALJ held a hearing on March 13, 2012, at which Dutcher, her son, and a vocational expert ("VE") testified. (AR 33-60.) She was represented by an attorney. (AR 33.) Counsel noted that he was asking the ALJ to consider Dutcher's left leg injury, right arm injury, and psychological impairments. (AR 49.) Dutcher appeared by telephone because she was unable to obtain transportation to the hearing. (AR 37.)

Dutcher testified that she holds an Associate's Degree in Business Administration from San Jose Community College. (AR 34.) Her previous substantial gainful employment was at Buffalo Thunder, a casino, where she was a cashier. (AR 36.) Her last day of work was January 21, 2012, at Walmart, but this was not substantial gainful employment, according to the ALJ. (AR 35.) Dutcher left that job because she could not stand for the required periods of time. (AR 36.) Before Walmart, Dutcher was a line server, dishwasher, and cashier at a bistro, but she left that job after she hurt her leg on July 5, 2009. (AR 35-36.) Dutcher testified that she wants to return to work. (AR 43.)

Dutcher stated that her injured left leg, with an unrepaired ACL tear, prevents her from standing or putting too much pressure on the leg, and that the pain extends from her left ankle to her left hip. (AR 36-37.) Dutcher said that, "If the ACL was repaired, [she] would [not] have that problem." (AR 37.) Dutcher said she has not had surgery to repair the ACL tear because she did not have transportation to the surgical office and has been unable to afford stable living conditions for the term of her recovery. (AR 41.) She had surgery on October 22, 2009, to repair the meniscal tear in her left knee. (AR 42.)

Dutcher testified that she has trouble climbing ramps or stairs (AR 45), uses a regular walking cane on a daily basis that was not prescribed by a doctor but was approved by Dr.

Gossum (AR 37, 42), and takes over-the-counter ibuprofen for pain (AR 45). She stated that she exercises "everywhere [she] can," including small walks around the apartment yard roughly three times per week and leg lifts with an exercise band three times every day. (AR 38-39.) Dutcher said that she can stand for approximately five minutes without her cane and fifteen minutes with the cane, and she can walk about half a block before she needs a five-minute rest. (AR 37-38.) She is unable to lift more than five pounds because her doctor told her not to. (AR 41.) Also on Dr. Gossum's orders, Dutcher testified that she elevates her leg roughly four-to-six times per day for thirty minutes to an hour at a time, at the mid-waist level. (AR 42.)

While cashiering at Walmart in 2012, Dutcher injured the "upper part of [her right] forearm and [her] shoulder." (AR 50.) She went to the emergency room the next day and was diagnosed with a sprained ligament and told that she had "torn a little bit of a muscle in [her] upper shoulder and underneath of [her] forearm." (AR 50-51.) The emergency room sent Dutcher to one day of physical therapy and gave her a sling and "some Lortabs" before discharging her. (AR 50.) Dutcher testified that she still wears the sling roughly three days per week. (*Id.*) Dutcher said that she can lift her right arm "about to where it curves" over her head, but that it is somewhat painful. (AR 51.)

Dutcher testified that she has symptoms of depression and gets "emotionally distraught" over her inability to work and take care of her family. (AR 52.) She said that her psychological symptoms started when she injured her knee in 2009 (AR 40), and that she "gets depressed" and has multiple crying spells throughout the day, approximately three or four times per week (AR 44, 52). Dutcher briefly saw a counselor for her depression in 2011, but was never prescribed any medication and never referred to a psychiatrist. (AR 52-53.) Dutcher admitted to a history of alcohol abuse, but said that she has been sober for five years. (AR 44-45.)

11

Dutcher testified that she lives with her twenty-three-year-old son, Michael Montaño, who does the errands and all of the housework (AR 39, 42), and her elder son, Jimmy, who is twenty-seven years old and mentally disabled (AR 39-40). Dutcher has a driver's license, but no car, and usually calls a friend or takes the bus when she has to go out. (AR 39.) Dutcher pays the bills using Jimmy's social security check. (AR 40.) On a typical day, she wakes up at six a.m., and Michael helps her into and out of the bathroom. (*Id.*) Michael then makes her breakfast around eight a.m. and helps her in and out of the bathtub around nine a.m. (*Id.*) Dutcher testified that she elevates her leg around ten a.m., and then it is lunchtime. (*Id.*) Michael prepares lunch; then Dutcher sits down until she needs to use the restroom, and she uses her cane to move around the apartment the rest of the day. (*Id.*) Dutcher testified that she stays in the house almost all day on most days. (AR 43.)

Dutcher's twenty-three-year-old son Michael testified that he holds an Associate's Degree in applied science and paralegal studies, but is not currently working outside the home. (AR 47.) Michael stated that he does all of the housework and helps his mother bathe. (*Id.*) He testified that Dutcher elevates her leg approximately four-to-six times per day for an average of about forty-five minutes each time. (*Id.*) Michael further stated that he helps Dutcher do her hair because she has limited range of motion in her right arm and the blow dryer is too heavy for her to hold. (AR 48.) He testified that Dutcher usually leans on him or a cane to move around the apartment, and he can tell when she is in pain based on the expression on her face or increased irritability. (*Id.*) Michael stated that he notices Dutcher in pain roughly four to five days a week. (*Id.*)

The ALJ then called the VE. (AR 53.) The VE testified that she had reviewed the file, familiarized herself with Dutcher's vocational background, and would testify consistent with the

Dictionary of Occupational Titles ("DOT"). (*Id.*) The ALJ and Dutcher's attorney agreed that Dutcher's work at Walmart and the Bistro did not qualify as "substantial gainful activity," and the ALJ therefore instructed the VE to base her testimony on Dutcher's cashiering job at Buffalo Thunder in 2008. (AR 55.)

In the first hypothetical, the ALJ asked the VE about an individual at the light level of work who needs a sit/stand option, meaning that the individual could alternate, at will, between sitting and standing, provided that they were not off-task more than ten percent of the day; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could frequently balance using a handheld assistive device for ambulation; could occasionally crawl or kneel; could frequently crouch or stop; and could not constantly reach overhead or handle with her right arm. (AR 56.) The VE testified that such an individual would not be able to perform Dutcher's past relevant work, but could be an office helper, a storage facility rental clerk, or a ticket seller, and that all three jobs exist in significant numbers in the national and regional economies. (AR 56-58.)

In the second hypothetical, the ALJ added the limitation that the individual could only perform simple, routine, and repetitive tasks. (AR 58.) The VE testified that the same jobs remain available to such an individual. (*Id.*)

The ALJ then questioned the VE about the basis for her testimony that these jobs allow a sit/stand option as described. (*Id.*) The VE stated that her testimony was based on the description of the jobs by the Department of Labor and on her observations in her professional capacity of individuals performing these jobs with a sit/stand option. (*Id.*)

Finally, in the third hypothetical, the ALJ asked the VE about an individual at the sedentary level who would need unscheduled breaks throughout the day to elevate her leg, as

needed. (AR 59.) The VE testified that such an individual would be unable to find employment in the national or regional economies. (*Id.*)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

At the first step, the ALJ found that Dutcher had not engaged in substantial gainful activity since the application date of August 18, 2009. (AR 22.) At the second step, the ALJ concluded that Dutcher suffers from the severe impairments of a left bone contusion and fracture of the lateral femoral condyle, an ACL tear, and a bucket handle meniscus tear. (*Id.*) The ALJ also concluded that Dutcher's alleged right arm sprain is not a severe impairment because it has not lasted for a continuous period of at least one year. (*Id.*) Furthermore, Dutcher's medically determinable mental impairment of depression causes only minimal limitations and is not severe. (AR 23.) In reaching this conclusion, the ALJ determined that Dutcher experiences mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace; she has experienced no extended episodes of decompensation. (*Id.*) At step three, the ALJ found that Dutcher did not have an impairment or combination of impairments equaling the severity of one of the listed impairments. (AR 24.)

As part of step four, the ALJ then determined that Dutcher has the RFC to perform light work, except that: she must be allowed to sit or stand at will, so long as she is not off-task more than ten percent of the work day; she should never climb ladders, ropes, or scaffolds; she can have no constant overhead reaching with her right arm; she can only occasionally climb ramps or stairs; she can occasionally crawl or kneel; she can frequently stoop and crouch; and she can frequently balance with the use of a handheld assistive device for ambulation. (*Id.*) The ALJ noted the two-step process for assessing a claimant's symptoms: 1) determining whether there is an underlying, medically determinable, physical or mental impairment that could reasonably be

expected to produce the symptoms; and 2) evaluating the intensity, persistence, and limiting effects of the symptoms to determine their impact on the claimant's RFC. (*Id.*)

In making this finding, the ALJ acknowledged Dutcher's testimony and that of her son at the hearing. (AR 24-25.) She then found that Dutcher's statements concerning intensity and persistence of the symptoms were not credible to the extent they were inconsistent with the RFC. (AR 26.) The ALJ reviewed medical evidence from PRMC, Eastern New Mexico Physicians and Surgeons, Dr. Sievers, Dr. Gossum, and Dr. Hill, as well as the opinions of state agency medical consultants. (AR 26-27.) The ALJ concurred with and adopted the opinions of the state agency medical consultants and accorded "significant weight" to the opinion of Dr. Sievers. (AR 27.) According to the ALJ, the record contains no documentation from a treating or examining doctor indicating that Dutcher is disabled or experiences limitations beyond those described in the RFC. (AR 28.) The ALJ further noted that Dutcher testified that Dr. Gossum authorized use of her cane, and she had been using it for about six months. (AR 27.) However, Dutcher last visited Dr. Gossum on January 26, 2010, and the evidence does not show that she ever saw Dr. Gossum again. (AR 28.) The ALJ found this inconsistency to weigh against Dutcher's credibility. (*Id.*)

At step five, the ALJ concluded that Dutcher could not perform any past relevant work. (*Id.*) However, based on Dutcher's age, education, work experience, and RFC, as well as the VE's testimony, the ALJ found that there are jobs in significant numbers in the national and regional economies that Dutcher can perform. (*Id.*) Based on her RFC, Dutcher can perform unskilled, light work, subject to the outlined limitations. (AR 29.) The ALJ resolved an apparent conflict between the lack of information about a sit/stand option in the DOT and the VE's testimony by relying on the VE's "expert knowledge of accommodations permitted in the specific jobs cited." (*Id.*) Based on her findings at step five, the ALJ concluded that Dutcher is

not disabled and is not eligible for benefits. (AR 29-30.) Dutcher appealed the decision to the Appeals Council, but the Council found that Dutcher's reasons for disagreeing with the outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the SSA. (AR 1-3.) The Council reviewed medical records from Mental Health Resources, Inc., dated April 24, 2012, through July 3, 2012, and concluded that the information was about a later time and did not affect the ALJ's determination. (AR 1.)

DISCUSSION

Dutcher argues that she has been disabled since July 5, 2009. She makes two broad arguments in favor of reversal and remand. First, she argues that the ALJ's decision was not supported by substantial evidence. Second, Dutcher argues that the ALJ erred by failing to order a consultative examination.

## I.      Substantial Evidence

Dutcher raises three points to argue that the ALJ's decision was not supported by substantial evidence. First, she challenges the ALJ's RFC finding that Dutcher can perform light work based on Dutcher's alleged limitations with regard to standing, walking, reaching, and handling. Second, Dutcher argues that the ALJ's reliance on the VE's testimony was contrary to law because the testimony was not consistent with the DOT. Third, Dutcher argues that the Appeals Council should have considered new evidence, and its failure to do so undermines the ALJ's decision.

### a.   RFC Finding that Dutcher Can Perform Light Work

The "RFC is what an individual can still do despite . . . her limitations. [It] is an . . . assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms . . . may cause physical or mental limitations or restrictions that

may affect . . . her capacity to do work-related physical and mental activities." 96-8p, 1996 WL 374184, at *2. A proper RFC includes a function-by-function assessment of the claimant's physical and mental capabilities. *Id.*

Dutcher challenges the ALJ's RFC on three grounds, which, Dutcher claims, makes the RFC finding unsupported by evidence and law. First, Dutcher argues that the ALJ failed to appropriately accommodate Dutcher's left leg impairment when considering the standing and walking requirements of light work in the RFC. Second, Dutcher alleges that the restriction on overhead reaching or handling with the right arm, included in the RFC, is insufficiently restrictive in light of the evidence. Third, Dutcher challenges the RFC because the ALJ did not make an explicit finding of Dutcher's ability to perform work activity on a regular and continuous basis.

On the first point, Dutcher seems to argue that the ALJ erred in deeming Dutcher fit for light work because of the sit/stand option. (Doc. 18 at 14-15.) In this portion of her argument, Dutcher seems to conflate the existence of substantial evidence to support the ALJ's RFC determination with the step 5 determination that there were jobs available in the regional and national economies that Dutcher could perform within the limitations of the RFC. (*See id.* at 16-18.)

The definition of light work states that:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, *or when it involves sitting most of the time with some pushing and pulling of arm or leg controls*. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary

> work, unless there are additional limiting factors such as loss of
> fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The ALJ noted each piece of medical evidence in the record, specifically pointing to Dr. Sievers, who placed Dutcher on "light duty" shortly after her knee injury, with no standing, bending, or walking in excess of five minutes; to Dr. Hill, who assessed Dutcher with an eight percent whole person impairment and noted that Dutcher ambulates fluidly, briskly, and without assistance; and the state agency medical consultants, who determined that Dutcher was able to perform light work, including standing, sitting, or walking for approximately six hours in an eight-hour workday. (AR 26-28.) Substantial evidence therefore supports the ALJ's finding that Dutcher can perform a wide range of the duties in light work, provided she has a sit/stand option and can relieve pressure from her left leg as needed.

On the second point, Dutcher argues that the RFC limitation of "no constant overhead reaching or handling with the right arm" is insufficiently restrictive and, therefore, not supported by substantial evidence. (Doc. 18 at 18.) Dutcher goes on to argue that because the ALJ included a reaching limitation despite her finding that Dutcher's right arm sprain was not a severe impairment, that the ALJ was therefore considering an impairment that can be expected to last for at least twelve months, pursuant to 42 U.S.C. § 423(d)(1)(A). (Doc. 18 at 19.) Despite the fact that Dutcher cites the statute for disability insurance benefits, rather than the applicable statute for supplemental security income—42 U.S.C. § 1382c(a)(3)(A)—her argument seems to want the law both ways: either the ALJ erred by placing an insufficient restriction in the RFC, or the ALJ erred by considering the right arm sprain at all. (*See* Doc. 18 at 19.) I find this argument unpersuasive.

The ALJ determined that the right arm sprain was not a severe impairment. (AR 22.) Dutcher testified that she experiences continued discomfort and some limitation in her ability to raise her right arm over her head or to carry weight. (AR 50-51.) Following the requirements of an RFC, where an ALJ must consider all medically determinable impairments, regardless of their severity, the ALJ considered Dutcher's right arm sprain. *See* 20 C.F.R. § 419.945(a)(2). The ALJ is not required to set forth specific medical evidence to support each section of the RFC, but most support the RFC as a whole with substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004); (Doc. 18 at 19).

The ALJ clearly considered Dutcher's and Michael's hearing testimony and the reports from the treating physicians relating to the right arm sprain because they are included in the RFC. Dutcher seems to be arguing that the ALJ did not give full and controlling weight to Dutcher's testimony that she experiences pain when reaching overhead. (*See* Doc. 18 at 18-19.) The ALJ discussed in her opinion a credibility analysis of Dutcher. Though Dutcher does not directly attack this analysis, it is certainly relevant to whether the RFC limitation with regard to the right arm sprain is supported by substantial evidence. At the hearing, Dutcher testified under oath that Dr. Gossum authorized her use of a cane. However, the medical records show that Dr. Gossum released Dutcher from his care on January 26, 2010, that she was not using a cane when she visited Dr. Hill in March 2010, and that there is no colorable suggestion that Dutcher ever again spoke with Dr. Gossum, despite the fact that she began using the cane five or six months before the hearing—more than a year after her last visit with Dr. Gossum. The ALJ found this inconsistency troubling and noted that it "reflects negatively on [Dutcher's] overall credibility." (AR 28.) While it is not my job to reweigh or reconsider the evidence, it is clear that the ALJ's reluctance to give full weight to Dutcher's subjective reports of pain was reasonable. In

connection with the medical evidence, I find that this portion of the RFC is also supported by substantial evidence.

Finally, Dutcher argues that the RFC is not supported by substantial evidence because the ALJ did not specifically reference Dutcher's ability to perform work activity on a regular and continuous basis, namely, five days per week for eight hours each day. (Doc. 18 at 20.) While the ALJ does not make specific reference to this requirement, she did adopt the state agency medical consultant's opinion, which clearly addresses Dutcher's ability to engage in work-related activity for eight hours a day, five days a week. (AR 27; *see also id.* at 281-88.) There is no authority suggesting that the ALJ's failure to explicitly discuss work activity on a "regular and continuous basis" constitutes reversible error. Therefore, I find the ALJ's failure to explicitly reference this element is harmless error because she incorporated the state agency medical consultant's opinion that was directly on point. Again, the RFC is supported by substantial evidence.

### b.  VE's Testimony Was Inconsistent with the DOT

Throughout her motion, Dutcher argues that the VE's testimony was inconsistent with the DOT, and that the ALJ failed to obtain a reasonable explanation for the apparent conflict. (Doc. 18 at 15-22.) In the first instance, Dutcher argues that it was error for the ALJ to rely on the VE's testimony that a person in a booth or an office would be able to sit or stand at will, based on the VE's professional experience. (*Id.* at 16-17.)   Second, Dutcher argues that the ALJ erred by failing to elicit testimony from the VE as to whether the proposed jobs required constant overhead reaching. (*Id.* at 20.) Lastly, Dutcher argues that the ALJ improperly relied on the VE's testimony that Dutcher could be a ticket seller because the DOT provides that being a ticket seller requires "constant" reaching and handling, specifically prohibited by the RFC. (*Id.* at 21-22.)

The Tenth Circuit requires an ALJ to reconcile the VE's testimony with the DOT when rendering a decision. *Haddock v. Apfel*, 196 F.3d 1084, 1090-91 (10th Cir. 1999). When resolving a conflict, the ALJ must elicit or provide a "reasonable explanation" for the conflict. *Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005) (citing *Haddock*, 196 F.3d at 1090-91). *Haddock* explains that "reasonable explanation[s]" would include the job the VE testifies about not being included in the DOT, as the Dictionary is self-avowedly not comprehensive, or that there is a specified percentage of a given job performed at a different or lower RFC, as the DOT describes maximum job requirements, and the VE may have knowledge of how the job is performed in a particular setting. 196 F.3d at 1091-92. Though the Tenth Circuit held that an ALJ may not "unreservedly accept" a VE's testimony when it contradicts the DOT, *id.* at 1091, a reasonable explanation includes the VE testifying from his or her professional experience, *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished).

The ALJ questioned the VE about the sit/stand option at the hearing. (AR 58.) The VE noted that there is no sit/stand option in the DOT for the referenced jobs, but testified that she based her testimony on the Department of Labor's explanations. (*Id.*) In accordance with *Haddock*, this explanation is sufficient to reconcile the VE's testimony with the DOT, and for the ALJ to rely on the VE's testimony as substantial evidence for the sit/stand option. Therefore, I find that the ALJ did not err by relying on the VE's testimony for the sit/stand option.

To the second point, the VE clarified with the ALJ, before providing her recommendations, that Dutcher was unable to engage in "constant" overhead reaching with her right arm. (AR 57.) In fact, the VE originally misunderstood the RFC as requiring Dutcher to constantly reach with her right hand. (*Id.*) Upon clarification that Dutcher was unable to constantly reach with her right hand, the VE testified that Dutcher could work as an office

helper. (*Id.*) Further, the limitation the VE testified about is actually more restrictive than the RFC limitation: the VE testified that Dutcher could perform this job if she was prohibited from constantly reaching with her hand, not just if she was prohibited from constantly reaching *overhead* with her right arm. (*Id.*) Therefore, I find that the ALJ did not fail to elicit testimony relevant to the RFC limitations and did not err in relying on the VE's testimony.

Finally, Dutcher argues that the VE did not testify as to whether being a ticket seller would require her to constantly reach overhead with her right arm, in violation of the RFC's limitations. For the reasons discussed above, this argument is without merit. However, even if Dutcher were unable to perform the job of ticket seller, the VE offered two other, unchallenged, jobs that fit within Dutcher's RFC. This argument is without merit. The ALJ properly reconciled the VE's testimony and relied on the same.

### c.  Appeals Council's Consideration of New Evidence

Dutcher argues that the Appeals Council failed to consider her records from MHR, that this evidence was qualifying new evidence, and that the Appeals Council's failure mandates remand.

The Appeals Council is required to consider evidence when it is new, material, and chronologically relevant. 20 C.F.R. § 416.1470(b); *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Evidence is "new" when it is not "duplicative or cumulative." *Lawson v. Chater*, 83 F.3d 432, 432 (10th Cir. 1996) (unpublished table decision) (quotation and citation omitted). Evidence is "material" when it creates a "reasonable possibility that it would have changed the outcome." *Id.* (alteration omitted). Evidence is chronologically relevant when it relates to the time period on or before the ALJ's decision. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003). If the evidence does not qualify, it is not part of the record for judicial

review of the Commissioner's decision. *Chambers*, 389 F.3d at 1142. If the evidence qualifies and the Appeals Council considered it, the evidence becomes part of the record for judicial review, to be considered when evaluating whether the Commissioner's decision was supported by substantial evidence. *Id.* If the evidence qualifies and the Appeals Council did not consider it, the case should be remanded to the SSA. *Id.*

Here, the Appeals Council stated that it "looked at" the records from MHR, but found the new information to be about a "later time" and, therefore, found that "it does not affect" the disability determination through the ALJ's decision of March 29, 2012. (AR 1.) I read this to state that the Appeals Council did not consider the records because they were not chronologically relevant. Further, the Appeals Council did not make the documents part of the administrative record, suggesting that the Appeals Council did not consider this to be qualifying new evidence. "Whether evidence qualifies as new, material[,] and chronologically relevant is a question of law subject to . . . de novo review." *Chambers*, 389 F.3d at 1142 (quotation, citation, and alteration omitted).

The parties do not dispute that the records from MHR are "new" within the meaning of the regulation. They do, however, disagree as to whether the records are "material" or "chronologically relevant."

Dutcher argues that the records are material because they show that her depression was triggered by her 2009 knee injury. (Doc. 18 at 24.) This issue was explicitly addressed at the hearing:

> Q    Okay. And, Georgia, would you explain to Judge Fernandez the other medical problems that are – affect you and your ability to return to work right now?

> A      Well, other than I have crying spells and I get depressed, there's – I mean, there's just too much going on.
>
> Q      And how long have you had the crying spells and, and feeling depressed?
>
> A      Since my accident on July 5th of – of 2009.

(AR 44) (exchange between attorney and Dutcher). At the hearing, the ALJ and Dutcher's attorney questioned Dutcher about her depressive symptoms, the treatment she received from Schwope, and when her symptoms began. (AR 44, 49, 51-53.) The fact that Dutcher saw a new counselor for a Comprehensive Assessment after the ALJ issued her decision, and reported to that counselor that her symptoms began when she injured her knee, does not shed light on the ALJ's decision or create a "reasonable possibility that it would have changed the outcome." *Lawson*, 83 F.3d at 432. Therefore, I agree with the Commissioner that the after-submitted evidence is not material.

Further, Dutcher argues that the records are chronologically relevant because Dutcher discussed the two preceding years with Gonzales during her evaluation. (Doc. 18 at 24.) Dutcher further challenges that the Appeals Council offered an insufficient explanation for not considering the evidence, particularly given that she sought counseling from Schwope in 2011. (*Id.*) Gonzales did not offer an opinion or diagnosis relating back to the period before the ALJ's decision (Doc. 18 Ex. 1), the ALJ explored Dutcher's alleged mental impairments at the hearing (AR 44, 49, 51-53), and the administrative record contains documentation from Dutcher's counseling services in 2011 (AR 299-305). The after-submitted records do not reflect Dutcher's condition prior to the ALJ's ruling, and it is insufficient that Dutcher discussed with Gonzales an alleged ailment that may have existed before the ALJ's ruling. *Wilson v. Apfel*, 215 F.3d 1338, at *1 (10th Cir. 2000) (unpublished table decision); *Lawson*, 83 F.3d at 432; *Priddy v. Massanari*,

No. 99-4195-DES, 2001 WL 1155268, at *2 (D. Kan. Sept. 28, 2001). This evidence fails to address Dutcher's condition as it existed on or before the ALJ's determination and is, therefore, not chronologically relevant.

## II.     Failure to Order a Consultative Examination

Dutcher argues that the ALJ failed to adequately develop the record when she did not rule on Dutcher's post-hearing request that the ALJ order a consultative psychological examination. (Doc. 18 at 22-23.) She argues that the ALJ should have ordered the consultative examination to help determine the degree to which Dutcher's pain and resulting depression impacts her functioning, and therefore the RFC analysis. (*Id.*) Dutcher notes that the record contains treatment notes from Schwope, but no other medical opinions from examining sources that relate to Dutcher's alleged mental impairment. (*Id.* at 22.)

Because a social security disability hearing is a nonadversarial proceeding, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see also Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). The ALJ's "basic duty of inquiry" requires her "'to inform [herself] about facts relevant to [her] decision and to learn the claimant's own version of those facts.'" *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring)).

"The Secretary has broad latitude in ordering a consultative examination." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990). "[T]he ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to

be of material assistance in resolving the issue of disability." *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997). The duty to develop the record extends to impairments that the ALJ may become aware of during the administrative hearing. *Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1996). The ALJ is required to order a consultative examination only when the medical sources on record are insufficient to allow the ALJ to make a disability determination. 20 C.F.R. § 416.917.

Dutcher submitted documentation about her counseling sessions with Schwope and testified at the hearing that she experiences crying spells. Schwope counseled Dutcher for about a month in 2011 and found her affect to be in the normal range and her mood to be normal. He did not note any particularly depressive symptoms. That Dutcher saw a counselor for one month and complained of stress related to her financial situation does not establish "the reasonable possibility of the existence of a disability." *See Hawkins*, 113 F.3d at 1169. She did not allege any mental impairments nor did she complain of psychological symptoms to her doctors. Dutcher's attorney did raise the issue of a mental impairment at the hearing, but has never pointed to a place in the record indicating that Schwope or another provider thought that Dutcher needed a psychological evaluation.

Dutcher submitted a report from MHR covering the period from April 24, 2012, through July 3, 2012. The ALJ denied Dutcher benefits on March 29, 2012. Even positing that the report is permissible new evidence under 20 C.F.R. § 416.1470, nothing in it creates the "reasonable possibility" that Dutcher is disabled. The medical evidence of record, including the report from MHR, was sufficient for the ALJ to make a disability determination.

## CONCLUSION

The ALJ's RFC finding that Dutcher could perform light work with a sit/stand option was supported by substantial evidence. Furthermore, the ALJ properly relied on the VE's testimony because there was a reasonable explanation for its conflict with the DOT. The Appeals Council appropriately rejected the after-submitted evidence from MHR as not being qualifying new evidence. Finally, the ALJ did not err by declining to order a consultative psychological examination because the issue of Dutcher's depression was appropriately raised and explored at the hearing, with sufficient medical evidence to render a decision. Therefore, I deny Dutcher's motion to reverse and dismiss this case with prejudice.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.